# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

-------------

BETTY HILEMAN,

      *Plaintiff/Appellant*,

v.                                        Civil No. 04-803 WJ/DJS

N.M. DEPARTMENT OF HEALTH, et al.,

      *Defendants*.

## MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' DAUBERT MOTION

THIS MATTER comes before the Court pursuant to Defendants' Gutierrez and Gonzales Motion for Partial Summary Judgment on Counts V and VII (Doc. 81), Defendants' Motion for Partial Summary Judgment on Counts I, II, III and IV (Doc. 86) and Defendants' Daubert Motion to Exclude Plaintiff's Witness Gene Valdes as an Expert Witness (Doc. 83).  Having reviewed the submissions of the parties and being otherwise fully advised on the law, I find that the partial summary judgment motion filed by Defendants Gutierrez and Gonzales is well taken and will be granted.  The partial summary judgment motion filed by all Defendants is also well taken and will be granted.  In light of my rulings on the summary judgment motions, I conclude that Defendants' Daubert motion is moot and will be denied as such.

## BACKGROUND

Plaintiff's Complaint in this matter was removed to this Court on July 16, 2004.  Plaintiff alleges claims under 42 U.S.C. § 1983 for violation of her First Amendment and Fourteenth

Amendment rights, claims under the New Mexico Human Rights Act, N.M. Stat. Ann. 1978 § 28-1-7(I), and claims of defamation and prima facie tort.  Viewing the evidence in a light most favorable to Plaintiff as the Court must in deciding a motion for summary judgment, the pertinent facts may be summarized as follows.

Plaintiff Betty Hileman was employed by the New Mexico Department of Health (DOH) in 1984.  She became the Vital Statistics Bureau Chief in 1988.  During the time relevant to this case, Defendant Patricia Montoya was the DOH Secretary, Defendant Laura Gutierrez was Records Manager in Vital Statistics and Defendant Joyce Gonzales was Plaintiff's secretary at Vital Statistics.  Defendants Gutierrez and Gonzales were Plaintiff's subordinates.

In 2000, Plaintiff and Defendant Sullivan, who was at that time an attorney within the DOH Office of General Counsel, had a disagreement over delayed birth registrations.  Plaintiff disputed Sullivan's interpretation of the law regarding such registrations, and their relationship was strained thereafter.  In 2003, Sullivan became DOH General Counsel and Plaintiff became apprehensive about her job security.

In mid May 2003, DOH received an anonymous note that one of Plaintiff's employees, Carla Konwin, was cheating on her time sheets.  Plaintiff was asked to investigate the allegation.  On May 19, 2003, Plaintiff advised her own supervisor, Deputy Division Director Toby Rosenblatt, and other DOH employees that, during her investigation, Konwin had reported receiving prurient material on her e-mail from another employee, Ana Socolov.  Konwin then spoke directly to Rosenblatt about the sexual harassment, and Rosenblatt assisted Konwin in drafting a complaint of sexual harassment and submitting it to former Defendant Gary Giron, Director of Administrative Services.  The complaint was investigated, found to be valid, and

remedial action was taken.  Neither Defendant Montoya nor Defendant Sullivan was aware that Plaintiff had reported Konwin's complaint of sexual harassment.  Defendant Gutierrez is the daughter of Ana Socolov, the person found to have sent inappropriate e-mails to Carla Konwin.

On or about June 22, 2003, a representative of a recent widow called the Governor's office asking for assistance in obtaining her husband's death certificate.  The Governor's office referred the matter to the DOH Secretary, Defendant Montoya, for a response.  Plaintiff refused to produce or create a death certificate because the Office of the Medical Investigator had not filed the necessary certification and Plaintiff understood that issuing a death certificate before OMI had filed the necessary certification would be fraudulent and a fourth degree felony under state law.  While Defendant Montoya does not recall receiving it or reading it personally, Plaintiff sent correspondence to the Secretary's Office explaining that she could not, even at the request of the Governor, produce or create a death certificate that had not been filed because it would be a felony to do so.  Plaintiff's refusal to immediately issue a death certificate caused friction between herself and the Secretary's office.

Both before and after the death certificate issue was resolved, there were several e-mails among the Governor's Office, the Secretary's Office and Plaintiff's Bureau.  None of the e-mails contained any request that Plaintiff's Bureau create or produce a fraudulent death certificate.  Nor did any of the e-mails express any rancor or dissatisfaction with how the issue was being or had been handled.  Instead, the e-mails expressed appreciation for the attention given to the issue.  However, Plaintiff's office received many telephone calls from the Secretary's office demanding that Plaintiff's Bureau produce and even create a death certificate.  None of these calls was made

3

by Defendant Montoya or Defendant Sullivan personally.  While Plaintiff received some of these calls personally, several of the calls were received by members of her staff.

Defendant Gonzales, Plaintiff's secretary, knew nothing of a request for a death certificate made by the DOH Secretary's Office.  While Defendant Sullivan does not remember anything about a request for a death certificate, Defendant Montoya testified that she may have discussed the issue with Sullivan.

In or about early August of 2003, Defendant Gutierrez, Plaintiff's subordinate, wrote out some complaints she had about Plaintiff and gave them to Defendant Gonzales.  Defendant Gonzales then typed these out as a "letter of concerns" directed to Jeff Varela, State Personnel Director, to whom Ms. Gonzales was related by marriage.  After Defendant Gutierrez signed the letter of concerns, she passed it to another employee.  The final letter bore the alleged signatures of fourteen of Plaintiff's subordinates though two of those signatures may have been forged and others who signed later recanted their support of the concerns expressed in the letter.  While the letter primarily contained the concerns of Gutierrez, in drafting the letter, Gonzales had included concerns of other employees.  Plaintiff's supervisor, Toby Rosenblatt, was not involved with the letter of concerns.  While Defendants state that Gonzales did not edit the complaints of the various employees, Gutierrez' testimony indicates that her own complaints as set forth in the letter were not in the same form in which she submitted them to Gonzales.  According to various accounts, Gutierrez and Gonzales both approached other employees to sign the letter.  The letter was sent directly to Mr. Varela rather than to Plaintiff's supervisor.

The State Personnel Rules and Department of Health (DOH) policies and procedures provide for a chain of command for grievances.  Under these policies, the proper chain of

4

command for grievances against Plaintiff by her subordinates would have had them going first to her immediate supervisor the Deputy Division Director, then to the Division Director, then to the Deputy Secretary of the Department, then to the Secretary.  Defendant Gutierrez admits that she never made any complaints about Plaintiff to Plaintiff's immediate supervisor but contends that Plaintiff had threatened to terminate anyone she discovered making anonymous complaints about her.  Plaintiff denies ever threatening to terminate employees for complaining about her but urges that, by going directly to the State Personnel Director, Defendants Gutierrez and Gonzales as well as the other employees who signed the letter skipped five levels of the chain of command.

Toby Rosenblatt believed that, if employees felt uncomfortable using the chain of command to file a grievance, they were welcome and even encouraged to go around the chain of command.  Defendant Montoya testified that employees have the right to take complaints directly to the director of the state personnel office but that it is outside of DOH policies and procedural practices for a complaint by a staff member to go to the director of state personnel as opposed to the staff member's direct supervisor.

The letter of concerns contained twelve paragraphs and stated that Plaintiff managed through intimidation, yelled at people in the halls and during meetings, grabbed a phone out of an employee's hand, stated that she would refuse any further help to one of her subordinates, had an inappropriate relationship with one of her subordinates, engaged in favoritism toward Ms. Konwin, and insisted she be the only person to do job references for any of the employees. Defendant Gutierrez testified that she contributed to nine of the twelve paragraphs in the letter. During her deposition, Plaintiff testified that she believed the "concerns" set forth in the letter were inaccurate opinions rather than factual.  Plaintiff notes that her belief is not a qualified legal

opinion.  Plaintiff does not dispute that she made employees cry at times but states that she would often end up crying as well.

Defendant Gutierrez contends that her motives in participating in the letter of concerns were to resolve issues regarding Plaintiff's management style.  Defendants note that Toby Rosenblatt thought there were some problems with Plaintiff's management and that, while he never received any letters regarding her management style, employees had spoken with him on other occasions about Plaintiff's supervision.  Plaintiff acknowledges that Rosenblatt had noted occasional problems with her but notes that these problems were never the subject of any disciplinary action.  Plaintiff also urges that Gutierrez' motive was personal in retribution for Plaintiff's assistance to Ms. Konwin in pursuing a claim against Gutierrez' mother, Ms. Socolov.[1]

Upon receiving the letter of concerns, Mr. Varela forwarded it to the office of the DOH Secretary, Patricia Montoya.  Defendant Montoya does not remember actually seeing the letter of concerns at that time.  Defendant Sullivan, DOH General Counsel, briefed Montoya about the letter of concerns.  She also informed Rosenblatt's supervisor, Division Director Joyce Naseyowma-Chalan, of the letter of concerns.  Ms. Naseyowma-Chalan did not discuss the matter with Defendant Montoya, but did discuss it with Mr. Rosenblatt.  Rosenblatt admitted to Naseyowma-Chalan that he had dealt with at least one employee complaint regarding Plaintiff's supervision.  Defendant Sullivan advised Montoya to initiate an investigation into the concerns

---

[1]Defendant Gonzales testified that she did not even know about the e-mails from Ana Socolov to Carla Konwin until the day before Plaintiff was placed on administrative leave and that she never discussed the e-mails with Defendant Gutierrez.  However, there is a disputed issue of fact with regard to who knew what about this and when they knew it.  These credibility issues cannot be resolved on summary judgment, and the Court must assume the facts in a light most favorable to Plaintiff.

expressed in the letter.  Former Defendant Robert Caswell Investigations, Inc. (RCI), an outside

agency, was hired to conduct an investigation.  Defendant Montoya does not know who made this

hiring decision.  Defendant Sullivan testified that she was familiar with RCI before the

investigation of the letter of concerns and she contacted Risk Management to get outside

assistance with the investigation.  It is undisputed that Risk Management obtained the services of

RCI, and Sullivan then made the specific request to RCI to investigate the letter of concerns.

Plaintiff was placed on paid administrative leave on August 11, 2003.  Defendant Montoya

does not know who made the determination to place Plaintiff on administrative leave.  Defendant

Sullivan did not instruct Angela Lovato in human resources to place Plaintiff on leave, does not

know who prepared the notice placing Plaintiff on leave and does not recall having any input into

the notice.  On August 12, 2003, Plaintiff filed a grievance through the State Personnel system

against Mr. Giron and Defendant Montoya alleging they had retaliated against her for refusing to

commit a felony.  In her grievance, Plaintiff alleged that she was placed on administrative leave

because she complained of sexual harassment, and the complaint of sexual harassment was not

investigated because Plaintiff had refused a request by the Secretary's Office to violate the Vital

Statistics Act.  She also alleged that she was discriminated against on the basis of disability, age,

sex and sexual orientation.  On September 19, 2003, she filed a charge discrimination with the

New Mexico Human Rights Division claiming she was retaliated against for assisting an employee

in reporting sexual harassment.

Plaintiff was given a Notice of Contemplated Action (NCA) on September 25, 2003

informing her of a contemplated demotion.  Defendant Sullivan did not prepare the NCA but did

approve it for legal sufficiency.  The NCA informed Plaintiff that the reasons for the contemplated

action included treating employees in an inappropriate manner by yelling and screaming at them in a disrespectful way, by throwing an object toward an employee in a threatening manner, by retaliating against employees, by permitting extreme discrepancies between employees, by engaging in a romantic relationship with a subordinate, and other inappropriate behavior.  The NCA identified the evidence on which the reasons were based, including the letter of concerns. Plaintiff was given an opportunity to respond to the NCA and was informed in the NCA that she could inspect and obtain copies of any documentary evidence relied upon for the proposed demotion.  Plaintiff made a preliminary response on October 2, 2003 and received an extension for a full response.  She provided a lengthy response on October 16, 2003.  On October 17, 2003, a Notice of Final Action (NFA) was issued demoting Plaintiff from Bureau Chief to Epidemiologist.  The NFA was nearly identical to the NCA.

Plaintiff's supervisor, Toby Rosenblatt, was not involved in Plaintiff's demotion.  Plaintiff believes that Defendant Sullivan spearheaded the disciplinary process and made the ultimate decision with regard to her demotion.  However, Plaintiff's belief is not supported by evidence.[2] Defendant Sullivan did participate in the meetings regarding Plaintiff's demotion and provided legal advice.  RCI's investigation report regarding the letter of concerns was directed to Sullivan,

---

[2]Plaintiff's belief is based on statements allegedly made by Ms. Naseyowma-Chalan to Mr. Rosenblatt during the demotion process and based on the fact that Sullivan responded to Plaintiff's former attorney's attempt to communicate with Ms. Naseyowma-Chalan.  Rosenblatt's testimony regarding Ms. Naseyowma-Chalan's statement to him are hearsay; thus they are not evidence the Court may consider in ruling on motions for summary judgment.  See Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995).  With regard to Sullivan's responses to Plaintiff's former counsel's attempts to contact Ms. Naseyowma-Chalan, this is simply not evidence that leads to a reasonable inference that Sullivan, General Counsel for the DOH, was "calling the shots" when Plaintiff was demoted.

Sullivan was present for the briefing by the RCI investigator, and Sullivan reviewed the NCA. While I find that the evidence does not support a conclusion that Sullivan orchestrated Plaintiff's demotion, the evidence is susceptible of an inference that Sullivan actively participated in the decision-making process.  According to Defendants, the decision to demote Plaintiff was made by Fred Sandoval, Deputy Secretary of DOH, Ms. Naseyowma-Chalan, and Angela Lovato in human resources.[3]  Defendant Montoya did not attend any of the meetings regarding Plaintiff's demotion.

The DOH policy for progressive discipline is to use progressive discipline whenever appropriate.  However, the policy also states that there are instances when a disciplinary action, including dismissal, is appropriate without first having imposed a less severe form of discipline.

On October 24, 2003, Toby Rosenblatt completed Plaintiff's final performance appraisal (PAD) for her work at the Vital Statistics Bureau.  He gave her an overall rating of "S" for "successful."  This PAD was also signed by Rosenblatt's supervisor, Division Director Joyce Naseyowma-Chalan, who had signed the NFA a week earlier.

Plaintiff has asthma and claims to have a variety of environmental sensitivities related to her asthma.  Plaintiff also has chronic obstructive pulmonary disease (COPD).  Based on her environmental sensitivities, Plaintiff had requested that her work environment at the Vital Statistics Bureau be fragrance free.  This request had been accommodated during her tenure at Vital Statistics.  Her supervisor prior to Toby Rosenblatt had approved her request for an accommodation, and Plaintiff did not renew her request when Rosenblatt became her supervisor because the accommodation was already in place.  Rosenblatt was never aware that Plaintiff had environmental sensitivities or that she required a fragrance free work environment.

---

[3]Plaintiff refers to this last person as Angela Lobato.

As a result of her demotion, Plaintiff was moved to the Runnels Building where the epidemiologist unit was located.  Plaintiff had previously worked in the Runnels Building when the Vital Statistics Bureau was located there.  In the 1990's, while Plaintiff was working there, the Runnels Building flooded.  Plaintiff believes she became sensitized to mold that formed in the Runnels Building after the flood.  When Plaintiff returned to work at the Runnels Building after her demotion, she began to have increased health problems.  While Plaintiff discussed exposure to mold with her physician Dr. Riley,[4] she never requested a note from him to support a request to be moved from the Runnels Building.

A 2002 environmental assessment of the Runnels Building found that there was nothing in the building that would pose a significant health or safety risk to building occupants.  While the final report presented to DOH on April 16, 2002, a portion of which is included as an exhibit in the record, indicated that moderate mold was found in a piece of an HVAC filter, the full testing for mold included use of air sampler pumps and swabs, and the results of the full range of tests was not included in the exhibit.[5]  The final results, as reflected in a memo to building occupants on May 9, 2002, indicated that indoor levels of airborne mold and bacteria were very low and within expected ranges for the climate in Santa Fe.

Plaintiff contends through her own testimony that the results of the assessment indicating no significant health risk would apply to persons with healthy lungs, but that the environment did

_____

[4]Dr. Riley testified at his deposition that Plaintiff did not discuss this with him.  However, disputes must be resolved in favor of Plaintiff.

[5]The Court notes that this exhibit is incomplete as it includes only the first two pages of a thirteen page report.

pose a health risk to her because of her asthma and COPD.  Defendant Montoya does not recall every hearing that the Runnels Building was a "sick" building.

Plaintiff retired from state employment effective December 31, 2003.  Her decision to retire was based in part on her health problems which she associated with working in the Runnels Building.  She also retired because of the humiliation of her demotion.  After her retirement, on January 29, 2004, the DOH rescinded the NCA and NFA and reinstated Plaintiff's title of Bureau Chief.  Plaintiff's personnel records were changed to reflect that Plaintiff had retired from her former position, and Plaintiff was given back pay.  Based on the rescission, Plaintiff's grievance to the State Personnel Board was dismissed.  With regard to Plaintiff's complaint of discrimination, the New Mexico Human Rights Division issued a notice of no probable cause and a right to sue letter on May 12, 2004.  Plaintiff timely appealed the New Mexico Human Rights Division's decision.

Plaintiff's proposed expert witness, Gene Valdes, reached seven opinions after reviewing the investigative report by RCI; transcripts of interviews and summaries of taped interviews included in the RCI report; the memorandum placing Plaintiff on administrative leave; the NCA; Plaintiff's response to the NCA; the NFA; the appeal, pleadings and responses thereto submitted to the State Personnel Office in response to the NFA; a letter of reprimand to Plaintiff; grievances filed by Plaintiff and the responses and communications to those grievances; Plaintiff's communications to the State Personnel Director, the State Personnel Board and the Governor related to the RCI investigation and her grievances; the "letter of concerns;" Plaintiff's performance evaluations; Plaintiff's charge of discrimination and related documents; the DOH Code of Conduct, Violence in the Workplace Policy, payroll time sheets, Procedure Statement on

Discipline and Policy Statement on Discipline; State Personnel Board Rules; a treatise on "just cause;" and an article on human resource management. The seven opinions are summarized by Mr. Valdes in his Disclosure of Expert Testimony as follows:

<u>Opinion #1</u>.  The investigation by the New Mexico Department of Health and its agent, Robert Caswell Investigations, of allegations made against Betty Hileman was flawed in several critical respects and, thus, did not constitute a fair and objective investigation as is required prior to implementation of disciplinary action.
<u>Opinion #2</u>.  The Department of Health failed to give Hileman proper forewarning or foreknowledge of the possible or probable consequences of her conduct with regard to the allegation that she engaged in a romantic relationship with a subordinate, and that she allowed that relationship to interfere in the exercise of her duties.  By failing to properly give notice to Hileman of what was deemed to be misconduct and its consequences, she was denied due process and disciplined in contravention of the just cause standard.
<u>Opinion #3</u>.  Because Hileman was a classified employee subject to State Personnel Board Rules, the Department of Health was obligated to pursue progressive discipline in responding to her alleged misconduct.  In failing to do so and in simply demoting Hileman without prior imposition of lesser forms of discipline, the Department failed in its obligation to her to make good faith efforts to correct her behavior and, thus, denied her due process and violated the just cause standard.
<u>Opinion #4</u>.  Demotion was the penalty that was imposed on Hileman as a result of the investigation.  That demotion, in addition to being inconsistent with the Department's obligation to follow progressive discipline, failed to take into account Hileman's history of long, previously unchallenged service with the Department.
<u>Opinion #5</u>.  The six charges against Hileman, as set forth in the September 25, 2003 Notice of Contemplated Action, which were repeated verbatim as the bases for her demotion in the October 17, 2003 Notice of Final Action, were articulated in a vague and unclear manner.  Because of this, Hileman could not defend herself adequately and, thus, was denied her right to due process.
<u>Opinion #6</u>.  Hileman's final performance evaluation, which was contemporaneous with her demotion, does not support the disciplinary action taken against her.  This appraisal, the official statement of the Department of Health with regard to Hileman's performance, is in contradiction to the harsh action taken by the Department.
<u>Opinion #7</u>.  Hileman's departure from the Department of Health on December 31, 2003, in the form of a voluntary retirement, can be characterized as a constructive discharge.

Exhibit A to Defendants' Daubert Motion.

By Plaintiff's account, she has suffered as a result of the investigation and her subsequent demotion. People she used to work with began treating her with disdain after she was escorted from the building pending the RCI investigation, and several people have avoided her. Plaintiff testified that Edward Griego, one of her subordinates whose alleged signature appears on the letter of concerns, tried to run her off the road. She testified that some other state employees told her they felt their jobs would be in jeopardy if they maintained any type of relationship with her. According to Plaintiff, several employees thought she had been demoted for misappropriating state funds or had been taken out in handcuffs. In December 2003,[6] Plaintiff obtained a new job and was approached during her orientation by a coworker. The coworker informed Plaintiff that she was a friend of Defendant Montoya's and believed that Plaintiff had caused Montoya to be fired from DOH. Three weeks later, Plaintiff's new supervisor met with the coworker and subsequently fired Plaintiff. Defendants point out, however, that nobody has actually told Plaintiff they want nothing to do with her, and nobody has overtly stated that she is a bad person. Additionally, none of her personal friends has indicated a desire to avoid her because of her demotion.

In Count I of her Complaint, Plaintiff appealed the no probable cause determination of the Human Rights Division. By a stipulated Order (Doc. 51), the Court dismissed this claim with regard to all individual Defendants such that this claim is brought only against the New Mexico

---

[6]Plaintiff's affidavit indicates that she obtained this new job in December 2003. However, it also indicates she obtained this job a year after her retirement from the State of New Mexico which also occurred in December 2003. It is likely that Plaintiff obtained the new job in December 2004, but this is not a material distinction for purposes of this motion.

13

Department of Health.[7]  Count II was brought under 42 U.S.C. § 1983 for violation of Plaintiff's

First Amendment right to freedom of speech, and Count III, also brought under Section 1983,

alleged a violation of Plaintiff's Fourteenth Amendment right to due process.  By stipulated Order

(Doc. 51), the New Mexico Department of Health was dismissed as a Defendant for these claims

such that these claims are brought only against the individual Defendants, Sullivan, Montoya,

Gonzales and Gutierrez, in their individual capacities.  Count IV alleges a claim of constructive

discharge and is apparently brought against all Defendants.  Count V is a claim of defamation and

is only brought against Defendants Gutierrez and Gonzales.  Count VI was only brought against

former Defendant RCI, this Defendant was dismissed by a stipulated Order (Doc. 49), so Count

VI is no longer an issue in this case.  Count VII is a claim of prima facie tort and is only brought

against Defendants Gutierrez and Gonzales.  Defendants Gutierrez and Gonzales filed a motion

for summary judgment with respect to Counts V and VII arguing they are entitled to immunity

from these claims under the New Mexico Tort Claims Act.  All Defendants filed a separate

motion for summary judgment with respect to Counts I, II, III and IV.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Worrell v.

Henry, 219 F.3d 1197, 1204 (10th Cir. 2000).  The burden of showing an absence of a genuine

issue of material fact falls upon the moving party.  See Adler v Wal-Mart Store, Inc., 144 F.3d

664, 670 (10th Cir. 1998).  However, when the moving party does not bear the ultimate burden of

---

[7]Plaintiff had previously dismissed the individual defendants sued in their official
capacities.  See Notice of Dismissal filed November 16, 2004 (Doc. 33).

persuasion at trial, it may satisfy its burden at the summary judgment stage by pointing out to the Court that there is an absence of evidence to support the nonmoving party's case.  Celotex Corp. v Catrett, 477 U.S. 317, 322-23 (1986); Adler, 144 F.3d at 671.  The nonmoving party must then go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial sufficient to support a verdict for the nonmovant.  Anderson v Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  In ruling on a motion for summary judgment, a Court does not weigh the evidence, but determines whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Jeffries v. State of Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998).  In making this determination, the Court must construe all the facts in the record and reasonable inferences that can be drawn from those facts in a light most favorable to the nonmoving party.  Worrell, 219 F.3d at 1204; Jeffries, 147 F.3d at 1228.

**DISCUSSION**

I.   GUTIERREZ' AND GONZALES' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR DEFAMATION IN COUNT V AND PRIMA FACIE TORT IN COUNT VII.

The New Mexico Tort Claims Act (NMTCA) grants sovereign immunity to certain governmental entities and public employees while acting within the scope of their duties, and limits the waiver of this immunity as governed in the NMTCA.  N.M. Stat. Ann. 1978 § 41-4-4(A).  There is no waiver of immunity for defamation claims except with regard to law enforcement officers.  N.M. Stat. Ann. 1978 § 41-4-12.  Defendants Gutierrez and Gonzales are not law enforcement officers.  There is no waiver of immunity for prima facie tort claims.

Derringer v. State, 68 P.3d 961 (N.M. App. 2003).  Thus, these Defendants are immune from a suit for defamation or prima facie tort arising from their actions within the scope of their duties.

Plaintiff's Complaint alleges that Defendants Gutierrez and Gonzales defamed her when they presented their letter of concerns to the State Personnel Office.  She also alleges that Defendants Gutierrez and Gonzales committed a prima facie tort by the intentional manipulation of information or communication of false information about Plaintiff to the State Personnel Office. She alleges that these Defendants were acting outside the course and scope of their employment with the DOH when they wrote and presented the letter of concerns to the State Personnel Office. Defendants contend they were acting in the course and scope of their employment when they wrote and presented the letter, they are protected by sovereign immunity for this conduct, and there is no applicable waiver of sovereign immunity for this conduct.

The NMTCA defines "scope of duties" as "performing any duties that a public employee is requested, required or authorized to perform by the governmental entity."  N.M. Stat. Ann. 1978 § 41-4-3(G).  "Scope of duties" under the NMTCA differs from the common law term "scope of employment."  Derringer, 68 P.3d at 965.  New Mexico courts have determined that the legislature foresaw the possibility that a public employee could abuse the duties actually requested, required or authorized by her state employer.  Id.  The "scope of duties" includes officially unauthorized criminal or tortious acts by an employee when there is a sufficient nexus between the employee's duties and the act.  Celaya v. Hall, 85 P.3d 239, 245 (N.M. 2004).  It includes a failure to perform a duty.  Derringer, 68 P.3d at 965.  It also includes acts performed with a malicious motive.  Seeds v. Lucero, 113 P.3d 859 (N.M. App. 2005).  Whether acts are within the "scope of duties" is normally an issue of fact, and summary judgment on the issue is

16

only appropriate if only one reasonable conclusion can be drawn from the evidence in the record. Celaya, 85 P.3d at 245.

Under the New Mexico Administrative Code, each state agency must establish a written procedure by which employees may complain of problems associated with their working conditions.  N.M. Code R. § 1.7.6.13.  The DOH policy for grievances, promulgated in response to the Administrative Code, provides that an employee with a grievance should present it in the initial phase to the respondent, then, if no resolution is reached, to the respondent's immediate supervisor, and on up through the chain of command.  See DOH Policy Statement 02:17:01 (Plaintiff's Exhibit 18).

Pursuant to the Administrative Code, Defendants Gutierrez and Gonzales were clearly authorized by their state employer to make complaints and bring grievances.  Plaintiff argues that the letter of concerns was not within the scope of Defendant Gutierrez and Gonzales' duties because it was not taken through the chain of command as outlined in the DOH policy and because it was undertaken with a malicious motive.  As explained in Seeds, Defendants' motives in writing and sending the letter of concerns is not relevant to the inquiry whether the acts were in the scope of their duties.  As in Derringer, the fact that these Defendants may have failed to follow DOH policy and thus abused their duties in performing the authorized act of bringing a complaint does not take their conduct outside the scope of their duties.  Thus, the evidence is susceptible of only one reasonable interpretation -- Defendants Gutierrez and Gonzales were acting in the scope of their duties in preparing and distributing the letter of concerns. Accordingly, they are protected by the immunity provisions of the NMTCA which does not waive immunity for these Defendants for suits for defamation or prima facie tort and are entitled to

summary judgment with respect to these claims brought in Counts V and VII of Plaintiff's

Complaint.

II.     PLAINTIFF'S APPEAL OF THE HUMAN RIGHTS DIVISION'S DETERMINATION

An appeal of a Human Rights Division's determination under the New Mexico Human

Rights Act provides a Plaintiff with a trial *de novo* by jury on the issue of discrimination.  The

scope of review is much broader than traditional review of administrative decisions and includes a

trial de novo by jury with evidence presented from the administrative proceedings and any

additional relevant evidence.  Linton v. Farmington Municipal Schools, 527 P.2d 789, 790-91

(N.M. 1974).  In analyzing claims under the New Mexico Human Rights Act, New Mexico courts

often look to federal civil rights adjudication for guidance.  Garcia-Montoya v. State Treasurer's

Office, 16 P.3d 1084, 1099 (N.M. 2001); Smith v. FDC Corp., 787 P.2d 433, 436 (N.M. 1990).

Plaintiff's complaint of discrimination under the New Mexico Human Rights Act alleged

that the DOH retaliated against her for assisting an employee in reporting sexual harassment.  In

order for Plaintiff to succeed on her claim of retaliation, she must make a prima facie showing that

(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3)

there is a causal connection between the protected activity and the adverse employment action.

Gonzales v. N.M. Dep't of Health, 11 P.3d 550 (N.M. 2000).  Once a prima facie showing is

made, the defendant bears the burden of producing evidence that its actions were legitimate and

nondiscriminatory.  Garcia-Montoya, 16 P.3d at 1099.  If a defendant meets this burden, a

plaintiff must be afforded an opportunity to rebut the employer's proffered reason.  Id.

The only Defendant for this claim is the DOH.  Defendant does not argue on summary

judgment that Plaintiff cannot make a showing that she suffered an adverse employment action.

18

Nor does DOH argue that Plaintiff's evidence is insufficient to show a causal connection between the adverse employment action and the alleged protected activity. Defendant's only arguments at this stage are that Plaintiff did not engage in protected activity and that Plaintiff has offered no evidence of pretext.

Defendant contends that Plaintiff did not engage in protected activity when she advised Rosenblatt that Konwin had received inappropriate e-mails. DOH urges that Plaintiff was merely a "conduit" between Konwin and Rosenblatt because Rosenblatt actually provided Konwin with the assistance in making a formal complaint. Defendants also appears to imply that Plaintiff's conduct was not protected because Konwin's allegation was promptly investigated and resulted in remedial action. Additionally, DOH argues that Plaintiff's action cannot be protected activity because she was merely acting in accordance with DOH policies which prohibit sexual harassment and expect employees to report such harassment.

Defendants cites to no legal authority from which this Court may understand how DOH's prompt investigation of Konwin's allegations and the remedial actions taken have any bearing on whether Plaintiff's conduct was protected activity under the New Mexico Human Rights Act. Nor does Defendant offer any legal support for the contention that reporting sexual harassment is not protected under the New Mexico Human Rights Act when an employer has an internal policy prohibiting sexual harassment and requiring employees to report the harassment. The Court has not, and would not expect to, find any legal authority in support of these arguments as they are not well-reasoned and defy common sense.

Protected activity includes informal complaints to superiors, O'Neal v. Ferguson Const. Co., 237 F.3d 1248 (10th Cir. 2001), and complaints about the treatment of others, Ray v.

19

Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000).  Thus, Defendant's argument that Plaintiff's

conduct in reporting to Rosenblatt the possible sexual harassment of Konwin was not protected

because she was a mere conduit lacks merit.  Accordingly, for purposes of summary judgment,

Plaintiff has shown that she engaged in protected activity.  Because this is the only prong of the

prima facie showing disputed by the Defendant at this stage, the Court will also assume that

Plaintiff has made a prima facie showing of retaliation for purposes of summary judgment.

     Defendants now bears the burden of producing evidence of a non-retaliatory reason for

demoting Plaintiff.  Defendant submits that Plaintiff was demoted because her method of

supervising her employees included intimidation, threats, and yelling sometimes to the extent of

reducing her employees to tears.  Defendant having tendered a non-retaliatory reason for

demoting Plaintiff, Plaintiff bears the burden of showing that the proffered reason is a pretext.

     In order to show pretext, a plaintiff is required to show that the defendant's tendered

reason for the employment decision was not the genuine motivating reason, but rather was a

disingenuous or sham reason.  Burn v. Bd. of County Com'rs of Jackson County, 330 F.3d 1275,

1283 (10th Cir. 2003).  Plaintiffs typically show pretext by revealing "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of

credence." Jones v. Barnhart, 349 F.3d 1260, 1266 (10th Cir. 2003).  A plaintiff need not always

present additional evidence in order to show pretext; a plaintiff's prima facie case may itself cast

sufficient doubt on a defendant's proffered nondiscriminatory reasons to satisfy his burden of

showing pretext, and discrimination may be inferred from the falsity of the employer's

explanation.  Garcia-Montoya, 16 P.3d at 1100-01; see also, English v. Colorado Dept. of

<u>Corrections</u>, 248 F.3d 1002, 1009 (10th Cir. 2001).  Whether a proffered reason is a pretext for discrimination is often a credibility issue and often requires the weighing of circumstantial evidence.  <u>Juneau v. Intel Corp.</u>, 127 P.3d 548, 555 (N.M. 2005).  "Issues such as this should normally be left exclusively to the province of the jury."  <u>Id.</u>

Plaintiff argues that there is evidence of pretext because Ana Socolov is Gutierrez' mother, Socolov was the person who harassed Konwin, and thus a reasonable jury could find that Gutierrez' motive in generating the letter of concerns was retaliatory.  The letter was then given credence by DOH and Plaintiff's demotion was based on the letter.

Plaintiff's reasoning is flawed.  The letter of concerns may have been retaliatory, but the letter of concerns is not the adverse employment action on which Plaintiff's cause of action is premised.  The letter of concerns was generated by Plaintiff's subordinates, not her employer.  Thus, it is not an employment action of any kind.  The fact that the demotion, which is an adverse employment action, was based on complaints within the letter does not mean that the retaliatory intent of the letter is imputed to the demotion.  In other words, the characteristics and intent of the demotion do not take on the characteristics and intent of the letter even though the demotion was based on the letter.

There is no evidence to suggest that the persons involved in the decision to demote Plaintiff shared the motives of the persons who drafted and signed the letter of concerns.  There is no evidence that the persons involved in the demotion were even aware of any possible retaliatory motive on the part of the employees who drafted and signed the letter.  Thus, none of the circumstantial evidence that suggests a possible retaliatory motive for the letter is evidence of or

even relevant to the issue of pretext for purposes of Plaintiff's retaliation claim under the New Mexico Human Rights Act.

Plaintiff contends that the investigation report prepared by RCI contains numerous inaccuracies. Plaintiff's designated expert testified that RCI failed to interview all possible witnesses and failed to ask certain questions that should have been asked. Plaintiff also contends that various witnesses gave deposition testimony in this case that was inconsistent with the statements they gave during RCI's investigation, and that RCI's summary did not accurately reflect the statements. According to Plaintiff, the fact that RCI could have done a more thorough and accurate investigation, and the fact that some of the persons interviewed during the RCI investigation may have changed their story over time is sufficient to show the type of inaccuracies that give rise to an inference of pretext. However, Plaintiff's argument is based on a misunderstanding of the law. The issue when looking for evidence of pretext is not whether the investigation underlying the demotion contained inaccuracies; rather the issue is whether there are inaccuracies evident in the reason given for the promotion. At issue in this case is whether DOH genuinely believed its proffered legitimate reason for demoting Plaintiff, not whether the proffered reason was absolutely, flawlessly correct. See Hardy v. S.F. Phosphates Ltd. Co., 185 F.3d 1076, 1080 (10th Cir. 1999) (citing Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 411 (7th Cir.1997)).

Other evidence that Plaintiff offers of inconsistency is the evidence that, prior to her demotion, she had never received any formal disciplinary action. Additionally, after her demotion, Plaintiff received an overall "successful" rating on her PAD for her work at Vital Statistics. This evidence is insufficient to meet Plaintiff's burden of showing pretext. The fact that Plaintiff had

not had any prior reprimands of other formal discipline before she was demoted does not cast doubt on the motives of DOH in demoting her for having an inappropriate management style. There is evidence that there had been prior complaints.  With regard to Plaintiff's PAD, the Tenth Circuit has stated that "glaring contradictions" between the plaintiff's evaluations and the employer's proffered reason for taking the adverse action can give rise to an inference of pretext. See Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1380 (10th Cir.1994).  The overall rating on Plaintiff's PAD is not necessarily inconsistent with DOH's assertion that Plaintiff had a specific problem with her management style.  See Green v. New Mexico, 420 F.3d 1189, 1193 (10th Cir. 2005) (noting that an evaluation rating a plaintiff as successful on productivity-related criteria did not contradict the defendant's contention that it fired the plaintiff for failing to follow instructions).  Plaintiff bears the burden of showing an inconsistency and did not do so. Accordingly, Defendant DOH is entitled to summary judgment on Plaintiff's appeal of the Human Rights Division's determination with regard to her claim under the New Mexico Human Rights Act.

III.    PLAINTIFF'S CLAIM FOR VIOLATION OF HER FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH IN COUNT II.

1.    Plaintiff's First Amendment Claim With Respect to Defendants Gutierrez and Gonzales

Defendants urge that Plaintiff's First Amendment claim should be dismissed with respect to Defendants Gutierrez and Gonzales because there is no evidence these Defendants had any input into the decision to demote Plaintiff.  Plaintiff's response does not address this portion of Defendants' argument.

23

The First Amendment claim is brought pursuant to 42 U.S.C. § 1983.  An action under 1983 requires state action, and Plaintiff cannot establish state action by Defendants Gutierrez and Gonzales unless she can show that they were her supervisors or in some other way exercised state authority in their actions.  Whitney v. State of New Mexico, 113 F.3d 1170, 1174 (10th Cir. 1997) (citing West v. Atkins, 487 U.S. 42, 49 (1988)); Noland v. McAdoo, 39 F.3d 269, 271 (10th Cir. 1994).  A person acts under color of state law if she exercises power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.  Id.  In this case, it is undisputed that Defendants Gutierrez and Gonzales were Plaintiff's subordinates, and there is no evidence that either of them exercised state authority in any of their alleged actions.  Accordingly, these Defendants are entitled to summary judgment on Plaintiff's First Amendment claim in Count II.

2.    Plaintiff's First Amendment Claim With Respect to the Remaining Individual Defendants (Sullivan and Montoya)[8]

A First Amendment retaliation claim is evaluated using a well-established four part inquiry in which (1) the Court determines whether the Plaintiff's speech involves a matter of public concern; and, if so (2) the Court balances the Plaintiff's interest in commenting on matters of public concern against the interests of the Defendants, as employers, in promoting the efficiency of the public services it performs through its employees; then, if the balance tips in favor of the Plaintiff (3) the Plaintiff must show that the speech was a substantial or motivating factor in a detrimental employment decision; then, if the Plaintiff establishes that the speech was a factor, (4) the Defendants may demonstrate that they would have taken the same action with regard to

---

[8]As noted above, only the individual Defendants in their individual capacities are sued in Count II.

Plaintiff even in the absence of the protected speech.  Finn V. New Mexico, 249 F.3d 1241, 1246

(10th Cir. 2001); Lybrook v. Farmington Municipal Schools Bd. of Educ., 232 F.3d 1334 (10th

Cir. 2000).

"[A] public employee's statements on issues not of general public concern are unprotected

by the First Amendment."  Wilson v. City of Littleton, 732 F.2d 765, 767 (10th Cir. 1984).

"Whether an employee's speech addresses a matter of public concern must be determined by the

content, form, and context of a given statement . . .."  Id. at 768 (citing Connick v. Myers, 461

U.S. 138 (1983)).  To be protected speech, an expression must sufficiently inform the issue as to

be helpful to the public in evaluating the conduct of government.  Id. at 768.  Speech which

discloses evidence of corruption, impropriety, or other malfeasance on the part of public officials

is speech on a matter of public concern.  Schuler v. City of Boulder, 189 F.3d 1304, 1308 (10th

Cir. 1999).  Speech that seeks to expose improper operations of the government or questions the

integrity of government officials is also speech on a matter of public concern.  Conaway v. Smith,

853 F.2d 789, 797 (10th Cir. 1988).  Additionally, First Amendment protection applies to

protected speech even when a public employee communicates privately with her employer instead

of expressing her views publicly.  Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 413

(1979).  However, it is not sufficient that the subject matter of a public employee's speech be of

public concern; the actual content of the speech - what is actually communicated on the topic -

must itself be of public concern.  Wilson, 732 F.2d at 769.  While there is no *per se* rule that

speech made in the course of an employee's duties is exempt from First Amendment protection,

but that fact weighs heavily against a finding that the employee's speech was on a matter of public

concern.  See Koch v. City of Hutchinson, 847 F.2d 1436, 1443 (10th Cir. 1988).

Plaintiff alleges four instances when she engaged in protected speech. First, she alleges that she engaged in protected speech in 2000 when she disputed Defendant Sullivan's interpretation of the law regarding delayed birth registrations. Second, Plaintiff alleges she engaged in protected speech in 2003 when she refused to create a death certificate. Third, Plaintiff alleges she engaged in protected speech when she disagreed with Defendant Sullivan's legal opinion that birth certificates could be copied.[9] Finally, Plaintiff alleges that she engaged in protected speech when she assisted Carla Konwin in bringing a complaint of sexual harassment.

Plaintiff's disagreement with Sullivan in 2000 over delayed birth registrations was essentially a policy discussion between the head of the bureau dealing with birth certificates and an attorney for the DOH. This was a discussion that occurred during the normal course of Plaintiff's duties regarding what the DOH legal response should be when persons filed petitions for delayed birth registrations. There is no evidence that anyone within the Department was engaging in malfeasance or any improper conduct or that Plaintiff's speech sought to expose such conduct. The mere fact that Plaintiff, a DOH administrator, disagreed with a DOH attorney's legal opinion does not show that Plaintiff was speaking out on improper operations of government or a lack of official integrity. Accordingly, this was not speech on a matter of public concern.[10]

---

[9]The record does not indicate when this occurred.

[10]In their Reply brief, Defendants note that this speech occurred more than two years prior to Plaintiff's demotion and argue that no inference of retaliatory motive may be drawn. Defendants are correct that speech so remote in time from adverse action generally cannot support an inference of retaliatory motive. See Maestas v. Segura, 416 F.3d 1182, 1189 (10th Cir. 2005). However, Defendants' motion only argued that Plaintiff's speech was not protected and did not challenge Plaintiff's ability to show that her allegedly protected speech was a substantial or motivating factor in her demotion. Thus, Plaintiff had no burden, in her response to the motion for summary judgment, of showing that her speech was a substantial or motivating factor in her demotion. Accordingly, the Court does not rely on this delay in its analysis.

Similarly, Plaintiff's speech that copying birth certificates would violate state law is not speech on a matter of public concern.  There is no evidence that photocopies of birth certificates were being issued such that Plaintiff's speech sought to expose malfeasance or improper operations of government.  Again, Plaintiff was debating with Sullivan over the legal interpretation of a statute and discussing whether the DOH could begin photocopying birth certificates.

Plaintiff's speech regarding the creation of a death certificate is also not speech on a matter of public concern.  From the evidence, it may be inferred that Plaintiff was asked by the Secretary's Office to create a death certificate.  It may also be inferred that Plaintiff informed the Secretary's Office that creating death certificates before OMI had filed the necessary paperwork would be illegal.  However, there is no evidence that the Secretary's Office, after being informed of the law, made any further request that Plaintiff create a death certificate or placed any pressure on Plaintiff to do anything in violation of law.  Nor is there any evidence that anyone engaged in malfeasance or that anything improper was done.  It was part of Plaintiff's job duties to communicate with the Secretary's Office regarding the proper and legal manner of obtaining a death certificate.  Plaintiff's speech did not seek to expose impropriety or malfeasance.  Thus, this was not speech on a matter of public concern.

Plaintiff's assistance to Carla Konwin in complaining of sexual harassment is not speech on a matter of public concern.  This is not a case in which Plaintiff opposed her employer's retaliation or discrimination against an employee.  See Patrick v. Miller, 953 F.2d 1240, 1247 (10th Cir. 1992) (an employee's opposition to unlawful retaliation against another is protected speech because it discloses evidence of corruption, impropriety or other malfeasance of

27

government officials).  Rather, Plaintiff was the recipient of her subordinate's report of

harassment and conveyed this report to her own supervisor.  As such Plaintiff was acting in the

course of her duties in addressing an internal concern between subordinate co-workers.

Because Plaintiff did not engage in any protected speech, Defendants are entitled to summary

judgment with regard to Plaintiff's First Amendment claim.[11]

IV.     PLAINTIFF'S CLAIM FOR VIOLATION OF HER FOURTEENTH AMENDMENT
        DUE PROCESS RIGHTS IN COUNT III.

        1.      Defendants Gutierrez and Gonzales

        Defendants contend that Defendants Gutierrez and Gonzales did not violate Plaintiff's due

process rights because they played no part in the decision-making process to demote Plaintiff.

Plaintiff's due process claim is premised on 42 U.S.C. § 1983, and as noted above, such a claim

requires state action.  Plaintiff cannot establish state action by Defendants Gutierrez and Gonzales

unless she can show that they were her supervisors or in some other way exercised state authority

in their actions.  Whitney v. State of New Mexico, 113 F.3d 1170, 1174 (10th Cir. 1997) (citing

West v. Atkins, 487 U.S. 42, 49 (1988); Noland v. McAdoo, 39 F.3d 269, 271 (10th Cir. 1994).

It is undisputed that Gutierrez and Gonzales were Plaintiff's subordinates.  Thus, they did not act

with the authority of the state in drafting the letter of concerns or directing the letter to the state

personnel director.  Accordingly, Plaintiff cannot show that these Defendants violated her due

---

        [11]It is possible that Defendants would have been entitled to summary judgment on
Plaintiff's First Amendment claim if they had provided argument and evidence on the third and
fourth prongs of the Pickering balancing test.  The Court has doubts regarding the merits of this
claim but cannot relieve Defendants of their burden of showing they are entitled to judgment as a
matter of law.

process rights, and these Defendants are entitled to summary judgment on Plaintiff's due process claim in Count III.

      2.    <u>Remaining Individual Defendants (Sullivan and Montoya)</u>[12]

Defendants argue that they are entitled to summary judgment on Plaintiff's procedural due process claim because Plaintiff received all the process she was due and because the individual Defendants are entitled to qualified immunity on this claim.  The defense of qualified immunity is designed to shield public officials from erroneous suits as well as liability and protects all but the plainly incompetent or those who knowingly violate the law.  <u>Holland v Harrington</u>, 268 F.3d 1179, 1185 (10th Cir. 2001); <u>Hinton v City of Elwood, Kansas</u>, 997 F.2d 774, 779 (10th Cir. 1993).  For this reason, special standards apply to a summary judgment motion raising the defense of qualified immunity.  <u>Hinton</u>, 997 F.2d at 779.  When a defendant asserts a qualified immunity defense, Plaintiff bears the initial burden of making two showings. <u>Medina v. Cram</u>, 252 F.3d 1124, 1128 (10th Cir. 2001); <u>Holland</u>, 268 F.3d at 1185.  First, a plaintiff must show that a defendant's alleged actions violated a constitutional or statutory right.  <u>Medina</u>, 252 F.3d at 1128. The Court, in determining whether this showing is made, must assess whether the facts, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional or statutory right.  <u>Holland</u>, 268 F.3d at 1185.  If a favorable view of the alleged facts shows the violation of a constitutional or statutory right, the plaintiff must then show that the right was clearly established at the time the allegedly wrongful conduct occurred.  <u>Id.</u> at 1186.

---

[12]As with Count II, only the individual Defendants in their individual capacities are sued in Count III.

Plaintiff alleges that her due process rights were violated because:

(i)     Defendants Gutierrez and Gonzales filed their grievance against her outside the chain of command and not in accordance with the DOH policy on grievances.

(ii).    Plaintiff's demotion was not in accordance with state personnel rules and DOH policy because she was demoted without any progressive discipline.

(iii).   Her opportunity to respond to the Notice of Contemplated Action (NCA) was a sham as evidenced by the fact that the NFA was issued less than 24 hours after she submitted her response to the NCA.

With regard to the allegation that Defendants Gutierrez and Gonzales violated Plaintiff's due process rights by filing a grievance against her outside the chain of command, the Court has already concluded that this conduct did not involve any state action because neither Gutierrez nor Gonzales exercised any state authority with regard to their actions.  Moreover, the grievance policy requiring Plaintiff's subordinates to file grievances within their chain of command does not define the procedures due for protection of Plaintiff's property interest in her employment.  Plaintiff's property interest in her employment finds its source in state statutes and regulations.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985) (stating that property interests are created and defined by existing rules that stem from an independent source such as state law).  However, the question of what procedures are due for the protection of such a property interest is not to be answered by looking to state law.  Id. at 541.

Plaintiff's argument that she was deprived of due process because she was not given progressive discipline in accordance with state personnel and DOH policy also assumes that state policies define the procedures to which Plaintiff is entitled.  Like the DOH grievance policy, the

state personnel and DOH graduated discipline policies do not define the procedures due for the protection of Plaintiff's property interest in her employment.  Id. at 538, 541.  Even assuming that Plaintiff had a right to graduated discipline under some other theory of recovery, she did not have a constitutional due process right to such discipline.  Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th Cir. 1998) ("[T]he Constitution does not require that each individual receive the procedural guarantees provided for by the instrument which bestows a property interest"); see also, Llano v. Berglund, 282 F.3d 1031, 1035 (8th Cir. 2002); Voigt v. Savell, 70 F.3d 1552, 1563 (9th Cir. 1995); Brown v. Youth Ctr. at Topeka, 993 F.Supp. 572, 577-78 (D. Kan. 1995).

Plaintiff's final arguments is that the pre-deprivation procedure she was afforded, the opportunity to respond to the NCA, was a sham procedure.  She bases this argument on the fact that the NFA was issued within twenty-four hours of her response and was in all relevant respects identical to the NCA.  From this she infers that the decision to demote her had been made before she responded and her response was not considered.

Due process requires that a person be afforded notice and opportunity to be heard before being deprived of property, and the opportunity to be heard must be at a meaningful time and in a meaningful manner.  Corstvet v. Boger, 757 F.2d 223, 229 (10th Cir. 1985) (citing Matthews v. Eldridge, 424 U.S. 319, 333 (1976)).  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  Gilbert v. Homar, 520 U.S. 924, 930 (1997).  In determining the procedural protections due in a particular situation, a court considers the private interest at stake, the risk of erroneous deprivation through the procedures used and the probable value of different procedures, and the governmental interest including the burdens of providing different procedures.  Matthews, 424 U.S. at 335.

In <u>Sonnlietner v. York</u>, the Seventh Circuit used the <u>Matthews</u> factors in considering what pre-deprivation procedures were due a public employee prior to demotion.  304 F.3d 704 (7th Cir. 2002).  The court noted that the procedures due prior to a demotion were not necessarily the same as those required prior to termination because the private interest at stake is not as weighty. <u>Id.</u> at 712-715 (discussing <u>Gilbert</u>, 520 U.S. 924).  Thus, the pre-deprivation procedures prior to a demotion do not necessarily have to be as formal or intricate as those provided prior to a termination.

Without deciding the precise nature of the procedures that would meet due process requirements prior to Plaintiff's demotion, a fundamental principle of due process is the that the procedures be neutrally applied.  <u>Tonkovich v. Kansas Bd. of Regents</u>, 159 F.3d 504, 518 (10th Cir. 1998); see also, <u>Schacht v. Wisconsin Dep't of Corrections</u>, 175 F.3d 497, 503 (7th Cir. 1999) <u>abrogated on other grounds</u> as recognized in <u>Higgins v. Mississippi</u>, 217 F.3d 951, 954 (7th Cir. 2000).  Proceedings are not neutral if they are biased with respect to the factual issues being decided.  <u>Tonkovich</u>, 159 F.3d at 518.  However, honesty and integrity on the part of a decision-maker are presumed, and a substantial showing of bias is required to show that procedures were not neutrally applied.  <u>Id.</u>

In <u>Tonkovich</u>, a plaintiff argued that the procedures he was afforded prior to his termination were a sham because the decision-makers were biased.  The Tenth Circuit concluded that the plaintiff had failed to provide sufficient evidence of bias when there was nothing indicating that the decision-makers had a personal or financial stake in the decision and there were insufficient allegations to support a charge of personal animosity on the part of the decision-makers.  <u>Id.</u> at 520.

In this case,  Plaintiff alleges that Defendant Sullivan was a decision-maker in Plaintiff's demotion and felt personal animosity toward Plaintiff because Plaintiff had disagreed with Sullivan's legal conclusions on more than one occasion.  In attempting to show personal animosity on the part of Sullivan, Plaintiff offers evidence that Sullivan recommended to Defendant Montoya that allegations against Plaintiff in the letter of concerns be investigated, that Sullivan contacted Risk Management to obtain outside assistance for the investigation, that Sullivan briefed the outside investigator on the specifics of the requested investigation and that Sullivan participated in the decision-making process to demote Plaintiff.  She also alleges that the decision to demote her was made within twenty-four hours after she submitted her response to the NCA.  With regard to Defendant Montoya, Plaintiff provides evidence suggesting that there was tension between Montoya's office and Plaintiff's office after Plaintiff refused to issue a death certificate before OMI filed the proper certificate.  This evidence is insufficient to make the substantial showing of actual bias and overcome the presumption of impartiality on the part of Sullivan or Montoya.  Thus, Plaintiff has failed to show that the conduct of Defendants Sullivan and Montoya violated Plaintiff's procedural due process rights and these Defendants are entitled to summary judgment on Count III.

V.    PLAINTIFF'S CONSTRUCTIVE DISCHARGE CLAIM IN COUNT IV

Defendants contend that constructive discharge is not a cause of action in itself and is merely one method of proving termination for purposes of a claim under state law of wrongful termination.  Defendants then cite to cases from New Mexico state courts for the standards used to determine when a constructive discharge has occurred.  Plaintiff's response did not address the contention that constructive discharge is not a separate cause of action and did not pinpoint the

cause of action for which the constructive discharge is pled.  However, Plaintiff's response cites to Tenth Circuit cases for the standard used to determine when a constructive discharge has occurred.

Constructive discharge is not an independent cause of action, such as a tort or a breach of contract.  Gormley v. Coca-Cola Enter., 109 P.3d 280 (N.M. 2005).  An allegation of constructive discharge is often tied to a Plaintiff's claim of retaliation or discrimination under the New Mexico Human Rights Act.  See Ulibarri v. State of New Mexico Corrections Academy, 131 P.3d 43, 49 (N.M. 2006). It is also used to show an adverse action for purposes of a First Amendment retaliation claim under federal law.  Woodward v. City of Worland, 977 F.2d 1392 (10th Cir. 1992).  An allegation of constructive discharge is also seen in conjunction with a New Mexico state law claim for wrongful discharge in breach of contract or in violation of public policy.  See Gormley, 109 P.3d at 282.

To the extent Plaintiff is alleging constructive discharge as part of her Human Rights Act claim, this Court has already determined that Plaintiff's evidence is insufficient to show pretext and that Defendant New Mexico Department of Health is entitled to summary judgment on this claim.  Plaintiff may be alleging constructive discharge as part of her First Amendment claim or as a separate claim for wrongful discharge under state law using either a contract or tort theory.  Regardless of the independent claim to which the constructive discharge allegation attaches, Plaintiff must show that her employer by its illegal acts has made working conditions so difficult that a reasonable person in Plaintiff's position would feel compelled to resign.  Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002); Sanchez v. Denver Public Schools, 164 F.3d 527, 534 (10th Cir.1998); Bolden v. PRC, Inc., 43 F.3d 545, 552 (10th Cir.1994);

34

Ulibarri, 131 P.3d at 49.  A plaintiff must show she had no other choice but to quit. Garrett, 305 F.3d at 1221.

In this case, Plaintiff alleges that she was constructively discharged because she was demoted in a manner that exposed her to humiliation and because her new position forced her to work in the Runnels Building which exacerbated her environmental sensitivities.  With regard to the conditions at the Runnels Building, Plaintiff's evidence fails to establish a genuine issue of material fact that the Runnels Building has sufficient levels of mold or other irritants to pose a health or safety risk to building occupants.  Plaintiff's own testimony that the 2002 environmental assessment results only apply to healthy individuals and do not apply to persons with asthma and COPD is not competent - she has no established expertise in the interpretation of environmental assessment results as they might apply to persons with various health conditions.  Because Plaintiff has failed to provide sufficient evidence that the Runnels Building is a "sick building," the Court cannot conclude that there is any evidence that Plaintiff's working conditions in the Runnels Building were so intolerable that a reasonable person would have felt compelled to resign.

While the Court does not doubt that Plaintiff felt humiliated when she was demoted, the evidence does not show that the humiliation was more than what would normally attend a demotion.  To find that this level of humiliation creates working conditions that a reasonable person would find intolerable would be tantamount to a finding that a demotion is, by its very nature, a constructive discharge.  This would be an absurd result.  Thus, Plaintiff has failed to show a disputed issue of material fact with regard to her allegation of constructive discharge, and this claim in Count IV is dismissed.

VI.   DEFENDANTS' DAUBERT MOTION

Defendants moved to have the testimony of Gene Valdes excluded on the basis that he is not qualified as an expert and his testimony does not meet the validity and reliability standards of Daubert. Even assuming that Mr. Valdes' testimony meets the Daubert standard, his opinions are not relevant to Plaintiff's First Amendment retaliation claim which is the only claim remaining at this time. His opinions are aimed at the procedural aspects and alleged defects of Plaintiff's discipline and demotion and an ultimate conclusion regarding constructive discharge. These opinions are not relevant to any element of Plaintiff's First Amendment claim. Accordingly, Mr. Valdes' testimony will not be proper at the trial of this claim, Defendants' Daubert motion is moot, and the motion will be denied as such.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Gutierrez and Gonzales Motion for Partial Summary Judgment on Counts V and VII (Doc. 81) is hereby GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion for Partial Summary Judgment on Counts I, II, III and IV (Doc. 86) is hereby GRANTED.

IT IS FINALLY ORDERED that Defendants' Daubert Motion to Exclude Plaintiff's Witness Gene Valdes as an Expert Witness (Doc. 83) is hereby DENIED AS MOOT.

UNITED STATES DISTRICT JUDGE